**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WALSH/GRANITE JV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HDR ENGINEERING, INC., | ) | |
| | ) | Civ. A. No. 17-558 |
| Defendant. | ) | Judge Nora Barry Fischer |
| _____ | ) | |
| | ) | |
| HDR ENGINEERING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WALSH/GRANITE JV, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I.     INTRODUCTION

This litigation between contractor Walsh/Granite Joint Venture ("Walsh/Granite") and architect/engineer HDR Engineering, Inc. ("HDR") arises out of the Pennsylvania Department of Transportation's ("PennDOT") Rapid Bridge Replacement Project ("P3 Bridge Replacement Project") pursuant to which 558 bridges are to be replaced throughout the Commonwealth of Pennsylvania and remains ongoing.  In Count VI of its Consolidated Complaint, HDR seeks a declaratory judgment that Walsh/Granite "is not entitled to withhold monies from HDR for quantity growth damages for design elements not included in Exhibit H to the Phase II Contract." (Docket No. 79 at 21).   Presently before the Court are cross motions for summary judgment on

the declaratory judgment count. (Docket Nos. 146; 148). The motions have been exhaustively briefed and the Court conducted a motion hearing at which time counsel provided oral argument as to same, the official transcript of which has been filed of record. (Docket Nos. 146-151; 156-158; 160; 165-166; 170-171; 176; 188). After careful consideration of the parties' positions and for the following reasons, HDR's motion for summary judgment [146] is granted, in part, and denied, in part, and Walsh/Granite's motion for summary judgment [148] is denied.

II.     RELEVANT BACKGROUND[1]

A.  *The Parties' Relationship and Roles in the P3 Bridge Replacement Project*

Walsh/Granite and HDR are sophisticated entities with significant experience in large-scale construction ventures and have worked together on approximately six projects of this type over the past decade. (Docket No. 158 at ¶¶ 75-78). They have also ended up in litigation as a result of several of these projects. (Docket No. 158 at ¶ 78). Walsh/Granite and HDR have important roles in the P3 Bridge Replacement Project which was awarded by PennDOT to Plenary Wash Keystone Partners ("PWKP") to finance, design, construct and maintain 558 bridges for a 28-year period after a competitive bidding process. (Docket Nos. 156 at ¶¶ 4-5; 158 at ¶ 1). To this end, PWKP engaged Walsh/Granite as its lead contractor, which, in turn, hired HDR to serve as the principal architect/engineer in pursuit of the bid on the project. (Docket No. 156 at ¶ 12). Walsh/Granite and HDR have continued in these roles through the ultimate execution of the final design and construction of the replacement bridges which is ongoing. (*Id*.). HDR's engagement includes "provid[ing] professional review of the site investigation, preliminary and final design,

---

[1]     The Court notes that the parties have presented numerous disputes in their concise statements of material facts and responses thereto. (*See* Docket Nos. 156 (137 statements of fact, only 50 of which are undisputed); 158 (78 statements of fact, only 17 not disputed)).

construction observation, and other engineering services, from the inception through the completion of the design and construction work." (Docket No. 156 at ¶ 11).

Returning to the bidding process, on March 26, 2014, PWKP was one of four prequalified teams selected by PennDOT which were eligible to submit a proposal on the project. (Docket No. 156 at ¶ 7). PennDOT issued requests for proposals to the prequalified teams on August 12, 2014. (Docket No. 156 at ¶ 14). On September 29, 2014, PWKP submitted its proposal to PennDOT, which incorporated Walsh/Granite's fixed-price bid for the final design and construction work for the P3 Replacement Bridges Project. (Docket No. 156 at ¶ 77). PennDOT selected PWKP as the preferred proposer on October 24, 2014. (Docket No. 156 at ¶ 78). Thereafter, on January 8, 2015, PennDOT and PWKP entered into the Public-Private Transportation Partnership Agreement for the P3 Replacement Bridges Project. (Docket No. 156 at ¶ 79). On the next day, January 9, 2015, PWKP and Walsh/Granite entered into the Design-Build Agreement ("DBA") for the final design and construction services for the P3 Replacement Bridges Project, the terms and conditions of which incorporate the fixed-price bid submitted by Walsh/Granite. (Docket No. 156 at ¶ 80; Docket No. 158 at ¶ 2).

Prior to the execution of the DBA, Walsh/Granite and HDR entered into two contracts for HDR to provide design services in support of Walsh/Granite's anticipated proposal for, and subsequent performance of the DBA. (Docket No. 156 at ¶ 3). Specifically, on May 8, 2014, Walsh/Granite and HDR entered into the Agreement for Design Services – Phase I ("Phase I Design Agreement"), pursuant to which HDR was retained "to provide all architect/engineering design services required to respond to the Department's Request for Proposal, including the development of the project estimating spreadsheet and standard design plans for each replacement bridge type." (Docket No. 156 at ¶ 13; Docket No. 158 at ¶ 4). Later, on September 24, 2014,

Walsh/Granite and HDR entered into the Agreement for Design Services-Phase II, ("Phase II Design Agreement"), which became effective upon execution of the DBA between PWKP and Walsh/Granite. (Docket No. 156 at ¶ 81; Docket No. 158 at ¶ 5). Hence, the Phase II Design Agreement became effective on January 8, 2015.

*B. Relevant Terms of Phase I Design Agreement*

The parties agreed that HDR, as Architect/Engineer, would provide its Phase I services within a budget of $1,632,000.00, to be paid by Walsh/Granite. (Phase I Design Agreement, Ex. A). HDR's Phase I services included, among other things,

> (i) Project Estimating Spreadsheet – All engineering and other background required to support the development of the project estimating spreadsheet (MOAS); (ii) development of plans for 8 bridge sites for W/G comparison of bids with sub bids to inform bid numbers; (iii) development of Standard Bridge plans for each bridge type; and, representative Roadway plan set.

(Docket No. 156 at ¶ 17). The contract further noted that:

> [HDR's] Services shall include all services reasonably required (1) to fully comply with the requirements of the [PennDOT] RFP, including the design of the size, quality and character of the Project, its architectural, structural, mechanical and electrical systems, and the materials and such other elements of the Project, (2) to permit Contractor to do the cost estimating and scheduling and . . .

(Docket No. 156 at ¶ 16 (Phase I Design Agreement at § IV.A.2)). The Phase I Design Agreement requires HDR to provide Preliminary Design Documents that "shall substantively respond to, and be in compliance with the Owner's RFP and all applicable laws, statutes, ordinances, building codes, orders, rules, and regulations." (Docket No. 156 at ¶ 21 (Phase I Design Agreement at § IV.C.3)). In § II.H.2 of the Phase I Design Agreement, the term "Preliminary Design Documents" is defined as follows:

> Preliminary Design Documents means all conceptual design drawings, outline specifications and other documents necessary (1)

4

> to fully comply with the requirements of the Owner's RFP, including the design of the size, quality and character of the Project, its architectural, structural, mechanical and electrical systems, and the materials and such other elements of the Project, and (2) to permit Contractor to do the cost estimating and scheduling.

(Docket No. 156 at ¶ 18 (Phase I Design Agreement at § II.H.2)).

Some additional provisions of the Phase I Design Agreement are pertinent here. These terms and conditions set forth HDR's obligations to provide its services through qualified employees, perform its work to the standard of care, and recognized that HDR was exercising its own independent judgment in its performance of the services. Section IV.C.I provides that:

> The Architect/Engineer shall provide the Architect/Engineer's Phase I Services through qualified employees of the Architect/Engineer or qualified subcontractors of the Architect/Engineer, all of whom shall be duly licensed as appropriate to the Services and shall be paid by the Architect/Engineer.

(Docket No. 156 at ¶ 20 (Phase I Design Agreement at § IV.C.1)). The standard of care is set forth in § IV.F, as follows:

> F. ARCHITECT/ENGINEER'S STANDARD OF CARE. The standard of care for all professional services provided by the Architect/Engineer pursuant to this Design Agreement shall be the care and skill ordinarily exercised by members of the same profession currently practicing in the United States, on projects of similar size and complexity, in the same locality, and at the time the services are performed.

(Docket No. 156 at ¶ 23 (Phase I Design Agreement at § IV.F)). Section V.A.2 states that:

> [HDR] may rely on information provided by [W/G] regarding the Project, including information [W/G] obtains from the RFP, the [Department], [PWKP] and any Separate Consultants, . . . but [HDR] shall exercise its own judgment in interpreting and applying that information and determining whether the information is sufficient for [HDR]'s performance of its Services.

(Docket No. 156 at ¶ 24 (Phase I Design Agreement at § V.A.2)).

The parties also agreed that the Phase I Design Agreement would be governed by Pennsylvania law and consented to a number of additional provisions pertaining to the interpretation of the contract, most of which were later used in the Phase II Design Agreement and summarized below. *See* § II.D., *infra*.

### C. Preliminary Design Phase

As noted, the Phase I Design Agreement governed the preliminary design phase of the project and relevant here, one of HDR's main tasks was to complete the project estimating spreadsheet, i.e., the Mother of All Spreadsheets ("MOAS"). The MOAS is a spreadsheet prepared by HDR which contained engineering estimates of material quantities for over 500 different components it expected were needed to replace all 558 bridges. (Docket No. 156 at ¶¶ 32-33; Docket No. 158 at ¶¶ 12, 15). HDR's pre-bid estimated quantities were based upon survey information provided by Walsh/Granite and information from PennDOT pertaining to the existing buildings as well as its request for proposal. (Docket No. 158 at ¶ 32). HDR understood that the estimations on the MOAS would be used by Walsh/Granite to make its fixed-price bid for the P3 Replacement Bridges Project. (Docket No. ¶ 156 at ¶ 34). There was some back and forth between the parties concerning the estimates on the MOAS and updates were made, as necessary, prior to Walsh/Granite's submission of the bid in September of 2014. (Docket No. 158 at ¶¶ 13; 16-17).

### D. Negotiations on Phase II Design Agreement

In early to mid-August, 2014, the parties engaged in negotiations regarding the Phase II Design Agreement and Walsh/Granite also requested additional information from HDR as to the quantity growth estimates on the MOAS. (Docket No. 158 at ¶ 19). Specifically, HDR was asked "to develop a matrix to help quantify how the risks of [HDR's] estimated quantities may change over the duration of the project." (Docket No. 158-5, Walsh/Granite Exhibit 5). Naturally, HDR

personnel engaged in internal communications in an effort to respond to such request. HDR submitted multiple versions of the Design Quantity Growth Matrix (the "Matrix") to Walsh/Granite, the first of which was forwarded on August 27, 2014, received comments from Walsh/Granite, made updates, and ultimately provided a final version on September 24, 2014 which Walsh/Granite accepted. (Docket No. 158 at ¶ 20). The Matrix was attached as Exhibit H to the Phase II Design Contract and contains seven columns titled "Element-Item Description," "Unit," "Quantity," "Decrease Rare," "Decrease Likely," "Increase Likely," and "Increase Rare." (Phase II Design Agreement, Ex. H). There are 25 different items described in the "Element – Item Description" column. (*Id*.). HDR admits that it used its professional engineering judgment in preparing the Matrix. (Docket No. 156 at ¶ 42). The parties later agreed to modify the items in the Matrix, consolidating a number of items. (Docket No. 158 at ¶ 32).

Around the same time, representatives of the parties actively negotiated the terms and conditions of the Phase II Design Agreement. On September 24, 2014, HDR proposed language to Walsh/Granite entitled "HDR PROPOSAL REGARDING DESIGN QUANTITY GROWTH LIABILITY" which Walsh/Granite rejected. (Docket No. 156 at ¶¶ 72-73). HDR describes this proposal as capping its liability for quantity overruns between the Preliminary and the RFC Design to 5% of the Target Price of the Phase II Contract. (*Id*. at ¶ 73). The parties ultimately agreed upon the language which was utilized in § XII.H of the Phase II Design Agreement, i.e.: i) "the liability of Architect/Engineer" proposed by HDR was revised to "the damages of Architect/ Engineer"; ii) "shall be limited to" proposed by HDR was revised to "shall be defined by"; iii) "growth in Major Quantities" was stricken; and, iv) the 5% cap on HDR's liability or damages was stricken. (Docket No. 156 at ¶ 74). The parties then executed the version of the Phase II Design Agreement at issue in this lawsuit.

The parties initially agreed that HDR would provide its Phase II services for a target price of $108 million, but such fee was later amended to $113 million by agreement of the parties. (Docket No. 156 at ¶ 137).  HDR was also entitled to a $900,000 success fee upon the award of the bid to PWKP.  (Docket No. 156 at ¶ 136).  The Phase II Design Agreement incorporated and superseded the Phase I Design Agreement, "without prejudice to any Party's rights under the Design Agreement (Phase I)."  (Docket No. 156 at ¶ 81).  Section I of the Phase II Design Agreement states that "[t]o the extent portions of the Preliminary Design Documents are used in the performance of Architect/Engineer's Phase II Services under this Agreement, they will be subject to the terms of this Agreement." (Docket No. 156 at ¶ 82).  The Phase II Design Agreement services included the production of construction documents and § IV.A.3 provides:

> Construction Documents shall be based on the Accepted Proposal, and shall comply with the applicable law and Standard of Care. The quality of materials and workmanship and the quantities, dimensions, configurations, construction methods and techniques called for in the Construction Documents shall be as described in or reasonably inferable from the Accepted Proposal.

(Docket No. 156 at ¶ 85 (Phase II Design Agreement at § IV.A.3)).  The phrase is defined, as follows:

> "Construction Documents" means those Final Design Documents, consisting of drawings and specifications, to be prepared or assembled by [HDR] consistent with the Preliminary Design Documents, Accepted Proposal and approved to be released to [Walsh/Granite] for construction of the Project.

(Docket No. 156 at ¶ 84 (Phase II Design Agreement at § II.D.1)).

> [HDR] acknowledges that significant damage could be caused to [Walsh/Granite] in the event that the Construction Documents describe a project that differs from the Proposal Design, the PPA and the Design Build Agreement. [Walsh/Granite] and [HDR] therefore agrees (sic) the Phase II Deliverables Schedule provides

[HDR] with sufficient time and compensation to perform [HDR's] Phase II Services and is sufficient for the work described in the Accepted Proposal, the PPA and the Design Build Agreement, except the exclusions listed in Exhibit G.

(Docket No. 156 at ¶ 87 (Phase II Design Agreement at § IV.F)).

As with the Phase I services, HDR was required to perform its services using qualified personnel and in accordance with the standard of care.

The Architect/Engineer shall provide the Architect/Engineer's Phase II Services through qualified employees of the Architect/Engineer or qualified Subconsultants of Architect/Engineer, all of whom shall be duly licensed or under the immediate personal supervision of someone who is, as appropriate to the services to be provided and shall be paid by the Architect/Engineer.

(Docket No. 156 at ¶ 83 (Phase II Design Agreement at §§ III.A; IV.D.1)).

**ARCHITECT/ENGINEER'S STANDARD OF CARE**. The standard of care for all professional services provided by the Architect/Engineer pursuant to this Design Agreement shall be the care and skill ordinarily exercised by members of the same profession currently practicing in the United States, on projects of similar size and complexity, in the same locality, and at the time the services are performed.

(Docket No. 156 at ¶ 88 (Phase II Design Agreement at § IV.B)).

**ARCHITECT/ENGINEER'S PERFORMANCE:** Contractor shall not be liable for any loss or casualty caused by [HDR]. [HDR] assumes all risk of loss relating in any way to [HDR's] services regardless of whether [HDR] had previously been paid for such [HDR's] services.

(Docket No. 156 at ¶ 90 (Phase II Design Agreement at § XII.A)).

Section XII.H of the Phase II Contract is titled "QUANTITY GROWTH DAMAGES" and provides:

**QUANTITY GROWTH DAMAGES.** Project quantity estimates have been taken from an Excel spreadsheet (the "MOAS") based upon team input including partially developed design, RFP

documents, publically available reference documents, Architect/Engineer's and Contractor's experience and such studies and tests as were performed during Proposal preparation. Both increases and decreases in estimated unit quantities as measured by design documents are typical of design-build projects, therefore as part of the Phase I Services Architect/Engineer has developed a Design Quantity Growth Matrix (the "Matrix") attached as Exhibit H. The Matrix lists all those items for which unit quantities, in Architect/Engineer's opinion with review and comment from the Contractor, have a reasonable probability of changing consequent to advancing the Preliminary Design Documents to release for construction ("RFC") design documents, as well as estimates of the likely and rare percentage increases and percentage decreases in such unit quantities. In particular the Matrix identifies by line item (i) certain categories of materials required to construct the Project and, where applicable, equivalent production units which may include various type materials, ii) ranges of reasonably foreseeable quantity variances between relevant RFC design documents and Preliminary Design Documents and iii) reasons such quantity variances are foreseeable. The final, fully developed Matrix has been mutually agreed upon by Contractor and Architect/Engineer and is included herein to evidence such agreement.

Contractor acknowledges that for each of the materials and equivalent unit line item categories listed in the Matrix, Architect/Engineer has provided Contractor notice of foreseeable design quantity variability between Preliminary Design and Final Design consistent with the Standard of Care. In consideration of such data, Contractor and Architect/Engineer agree that notwithstanding any other provision of this Design Services Agreement (Phase II), and to the fullest extent permitted by law, the damages of Architect/Engineer, its subconsultants and their respective directors, officers and employees payable to Contractor, including Contractor's damages arising from Contractor's subcontractors claiming by, through or under Contractor for increases in the quantity of materials required to construct the Project from Contractor's quantity assumptions used in its Proposal (but not Contractor's other damages, in particular delay damages) shall be defined by actual costs for quantity growth, as measured by comparing the Preliminary Design to the RFC design that exceed the total growth for such quantities defined as the "rare" percentage increases in the Matrix. Quantity increases between as-built designs and RFC designs are not covered under the above limitation.

(Phase II Design Agreement at § XII.H). The Phase II Design Agreement attached the Matrix as Exhibit H. (Docket No. 156 at ¶ 31; Phase II Design Agreement at Ex. H). Exhibit H expressly notes that the estimated quantities do not reflect "post-final MOAS adjustments" and "final outliers," and that, "[b]y agreement with PWKP, Quantities will be finalized prior to NTP." (*Id*.). (Docket No. 156 at ¶ 31). Exhibit I provides, in relevant part:

> [WGJV] shall establish a Design Quantity Change Fund ("Fund") in the amount of $1,000,000 (One Million Dollars) held by the Contractor. This Fund shall be used to offset additional construction costs incurred as errors and omissions damage arising from quantity growth in excess of the net Design Quantity Growth across the categories of construction materials defined in the Matrix attached as Exhibit H. Actual quantity related additional construction costs, will be deducted from the Fund. Contractor reserves the right with respect to Architect/Engineer's errors and omissions related to Design Quantity Growth to proceed against Architect/Engineer and/or its insurer as provided in this Agreement to the extent such damages exceed the Fund.

(Phase II Design Agreement at Ex. I).

HDR was to be paid under a progress payment schedule attached to the contract. Such payments were subject to a withholding provision at issue in this case. To this end, § III.C.3 states that:

> Walsh/Granite "may withhold from any progress payment, and the final payment, an amount reasonably necessary to fully protect itself against any liability or damage relating in any way to this Design Agreement, Architect/Engineer's acts or omissions, or Architect/Engineer's breach of this Design Agreement."

(Docket No. 156 at ¶ 134, Phase II Contract at § III.C.3). The Phase II Design Agreement provides, in pertinent part, as follows:

> If at any time either party believes that the Project will exceed the Construction Budget or Construction Schedule, that Party shall notify the other Party and each shall propose changes in the Project or design to bring the Project within the Construction Budget and Construction Schedule. The Architect/Engineer shall incorporate

any changes requested by Contractor in the Construction Documents without additional cost, unless the changes requested by the Contractor are materially different from the Proposal Designs . . .

(Docket No. 156 at ¶ 110 (Phase II Design Agreement at § IV.D.10)).

Several provisions pertain to the interpretation of the agreement. To this end, Section XIII.E provides that the "Design Agreement and disputes related hereto shall be governed by the laws of the Commonwealth of Pennsylvania." (Docket No. 158 at ¶ 36 (Phase II Design Agreement at § XIII.E). Section XIII.I, of the Phase II Contract, titled "KNOWING CONSENT," provides, in relevant part:

> The Parties hereto acknowledge that they have been represented by competent legal counsel in the negotiation of this Design Agreement and all of the terms and conditions herein were drafted jointly and subject to each Party's review, comments and negotiations and consequently, no provision of this Design Agreement shall be construed against a Party on the grounds it was a drafter of this Design Agreement.

(Docket No. 158 at ¶ 35 (Phase II Design Agreement at § XIII.I)). The agreement also contains two similar merger clauses. Section XIII.D of the Phase II Contract, titled "Entire Agreement," provides, in relevant part:

> This Design Agreement constitutes the entire agreement between the Parties hereto. It is expressly understood and agreed that there are no agreements or promises by and between the Parties, except this Design Agreement, and any additions or changes thereto shall be in writing and signed by both Parties.

(Phase II Design Agreement at XIII.D). Another provision, section III.E titled "Entire Agreement; Exhibits" states the following:

> This Design Agreement, together with the contracts that are referenced in this Design Agreement, the RFP, and [Exhibits A-I attached to this Design Agreement] are incorporated in this Design Agreement by this reference and form the entire agreement between the Parties, and supersede all previous oral or written agreements or

representations, with the exception of the Architect/Engineer's
obligations under the Design Agreement (Phase I).

(Phase II Design Agreement at § III.E).

The parties further agreed to the applicability of general rules of contract construction and

the scope of the documents which make up their agreement in the following provision:

> **PRIORITY OF DOCUMENTS.** The language in all parts of this
> Design Agreement shall in all cases be construed: (i) simply, (ii) as
> a whole in line with its fair meaning, (iii) in accordance with
> generally accepted rules for contract construction, and (iv) not
> strictly for or against either Party. All the contract documents,
> including the PPA, Design Build Agreement with the Contractor,
> and the Design Agreement (Phase II), shall be construed and
> interpreted in a consistent, harmonious and supplementary manner.
> However, in the event the Design Agreement cannot be reasonably
> read using generally accepted rules for contract construction as a
> consistent, harmonious and supplementary contract consequent to
> omissions, irreconcilable conflicts, ambiguities or discrepancies
> among the Design Agreement documents, the precedence of
> contract documents for resolving such omissions, irreconcilable
> conflicts, ambiguities or discrepancies shall be as follows:

> 1. Design Agreement (Phase II) Change Orders, with
>    Change Orders affecting Exhibits having priority
> 2. Exhibits to Design Agreement (Phase II)
> 3. Design Agreement (Phase II)
> 4. Design Build Agreement
> 5. PPA

> With respect to the Design Build Agreement and PPA, the priority
> shall be as set forth in the Design Build Agreement.

(Phase II Design Agreement at XIII.J). The captions and subheadings are not to be used to modify

the parties' respective rights. (*See* Phase II Design Agreement at § XIII.G. ("The headings of

sections and paragraphs are for convenience only and shall not modify rights and obligations

created by this Design Agreement."). Further, "[w]ords and abbreviations which have well known

technical or trade meanings are used in this Design Agreement in accordance with such recognized

meanings." (Phase II Design Agreement at § XIII.H).

*F. Subsequent Activities*

"HDR was paid over $1,400,000.00 for its preliminary design work during the Pre-bid phase of the Project. HDR also received a success fee greater than $900,000.00 upon [PennDOT's] award of the P3 Replacement Bridges Project to PWKP." (Docket No. 156 at ¶ 136). The parties proceeded to work together for almost two years prior to the initiation of the claims which now form this litigation. On June 15, 2016, Scott Benjamin, Deputy Project Manager of Walsh/Granite sent a letter to Michael Krall of HDR titled "Notice of Claim" with a "Subject" of "Quantity Growth Damages on the Pennsylvania Rapid Bridge Replacement Project" setting forth that HDR was liable for $40 million in estimated damages. (HDR Ex. 2; Docket No. 147-1). The Letter provides, as follows:

> [Walsh/Granite] submits this letter to [HDR] as a notice of a claim against HDR for Quantity Growth Damages on the Project. HDR is liable for damages due to the increases in the quantity of materials required to construct the Project from [Walsh/Granite]'s quantity assumptions used in its Proposal.
>
> **The total amount of estimated damages is: <u>$40 million</u>**
>
> Under the Design Agreement (Phase II), quantity growth is measured by comparing the bid quantities ("MOAS" quantities) against the request for construction ("RFC") design that exceed the total growth percentage allowed for each listed item under the "Increase Rare" subheading. Exhibit H of the Design Agreement, lists the items for which unit quantities have a reasonable probability of changing from the MOAS to RFC. For these items, HDR is liable for quantity growth in exceedance of the "Increase Rare" percentages included in the exhibit. The blended project average for increase rare is 4.9%. However, HDR's liability is not limited to those items listed in Exibit H, as each item on the list also includes "equivalent production units," or additional materials not listed that may also increase due to quantity creep. Exhibit H was developed and certain items selected to represent the quantities on the entire Project and in no way limit HDR's liability to just those items listed in Exibit H. For all quantities not listed in Exhibit H, quantity overruns are errors and omissions and are a breach of the Standard of Care: W/G applied the 4.9% average increase rare. Further,

HDR's deductible on quantity growth liabilities is limited to $1 million pursuant to the Design Quantity Change Fund ("Fund") established between the Parties and described in Exhibit I of the Design Agreement.

Attached is a comparison of HDR and [Walsh/Granite] quantities for 46 bridges evaluated to date. The results are then projected forward and pro-rated to all 417 Remaining Eligible Bridges ("REBs") (it appears that net quantity growth for the Early Completion Bridges will not exceed the "Increase Rare" amount). The total quantity growth exceeds the percentage allowed under the Design Agreement. The result is approximately $40 million in damages, which includes the deduction of the 4.9% Rare Increase Assumption and the $1M Overrun Deductible.

[Walsh/Granite] respectfully asks this Claim be reviewed at the next meeting of the Executive Committee. If there is any dispute as to the claim, please respond accordingly.

(*Id.*).

"In September 2016, [Walsh/Granite] began withholding Project progress payments from HDR." (Docket No. 156 at ¶ 40). The parties apparently conferred but were unable to amicably resolve their disputes. "On April 12, 2017, [Walsh/Granite] wrote to HDR providing an accounting of project payments which identified amounts to be paid (including released withholdings), amounts to be withheld and billings rejected as improper. In this letter, [Walsh/Granite] advised it was withholding $18,316,125 to offset damages due to schedule delay ($4,276,872), quantity overruns ($12,334,253) and field rework costs ($1,705,000). Additionally, [Walsh/Granite] rejected $8,315,709 in improper billings." (Docket No. 156 at ¶ 135). This litigation was initiated on April 30, 2017 and HDR complains that the amounts of withholding and reasons articulated by Walsh/Granite for same have changed repeatedly. As of April 2018, Walsh/Granite has paid HDR approximately $130 million, well in excess of the amended target price of $113 million. (Docket No. 156 at ¶ 137). With that said, the parties clearly dispute both the amount of money Walsh/Granite has withheld and the reasons why the money is being

withheld.  (*See* Docket Nos. 156 at ¶¶ 135-137; 158 at ¶¶ 42-44; 48; 53; 54; 61-63; 68-69).  One of the central disputes is whether the following "substitute" and "dependent" items were properly withheld by Walsh/Granite:

<u>**Substituted Items**</u>
Soldier Pile Retaining Wall - $6,865,549
Rip Rap Apron (Culvert) - $697,683
Structure Mt. Guardrail - $2,088,465
PA Type 10M Bridge Barrier for Culverts - ($432,122)

<u>**Dependent Items**</u>
Wearing Course- $2,064,607
Variable Depth Milling – ($73,786)
Subbase (2a Roadway) – $5,012,261
Binder Course (Asphalt) - $2,091,912
Subbase (No. 2A) (Shoulder) - $337,653
Pavement Base Drain - $2,369,042
White Stripe - $554,940
Double Yellow Stripe - $669,262
Class 1 Excavation (Pavement Removal) – ($1,203,054)

(Docket No. 156 at ¶¶ 125; 133).

## III.    RELEVANT PROCEDURAL HISTORY

HDR initially asserted its declaratory judgment claim in the original complaint filed at Civil Action No. 17-782 and later filed its Consolidated Complaint in this consolidated action on November 9, 2017.  (Docket No. 79).  After receiving briefing from the parties and hearing oral argument, this Court denied Defendants' motion to dismiss HDR's declaratory judgment claim on November 7, 2017.  (Docket No. 75).  Walsh/Granite and the other Defendants submitted their Answers on December 1, 2017, denying liability.  (Docket Nos. 85; 86).  Upon HDR's application for a hearing under Rule 57 to resolve the parties' disputes as to the declaratory judgment claim and argument thereon, the Court ordered that the parties complete limited discovery and established a briefing schedule on summary judgment motions.  (Docket No. 96).

At the conclusion of discovery, the parties filed cross motions for summary judgment, supporting briefs, concise statements of material facts and appendices on June 1, 2018. (Docket Nos. 146-151). Responsive briefs, counterstatements of facts and appendices followed on July 2, 2018. (Docket Nos. 156-158; 160). Replies were filed on July 16, 2018. (Docket Nos. 165-166). Walsh/Granite supplemented the record with inadvertently omitted exhibits on the same date. (Docket No. 167). Sur-reply briefs were then submitted by both parties on July 30, 2018. (Docket Nos. 170-171).

The Court held a motion hearing on August 14, 2018 during which the parties presented oral argument through their respective counsel. (Docket No. 176). The official transcript of those proceedings was filed on October 10, 2018. (Docket No. 188). Needless to say, the pending cross motions for summary judgment have been exhaustively briefed and are now ripe for disposition.

IV.    LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "When confronted with cross-motions for summary judgment, the 'court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Anderson v. Franklin*

*Institute*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting *Schlegel v. Life Ins. Co. of N. America*, 269 F. Supp. 2d 612, 615 n. 1 (E.D. Pa. 2003)); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co*., 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs*., 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or answers to interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## V.    DISCUSSION

The legal disputes at issue surround the parties' competing interpretations of § XII.H of the Phase II Design Agreement and the Quantity Growth Matrix, attached as Exhibit H to same. (*See* Phase II Design Agreement at § XII.H; Ex. H).   In their agreement, the parties allocated the risk of loss arising from material quantity growth between HDR's preliminary designs, which were used by Walsh/Granite to bid on the project in September of 2014 and the request for construction designs produced by HDR for each of the bridges while the project was ongoing.  (*Id.*).  Notably, the provision expressly states that "[q]uantity increases between as-built designs and RFC designs are not covered under the above limitation." (*Id.*).

HDR seeks a declaratory judgment that Walsh/Granite "is not entitled to withhold monies from HDR for quantity growth damages for design elements not included in Exhibit H to the Phase II Contract." (Docket No. 79 at 21).   In its motion for summary judgment, HDR contends that the provision is unambiguous and should be interpreted to mean that its liability for alleged quantity growth between the preliminary design and the request for construction designs is limited to the 25 items which are expressly set forth on the Matrix.  (Docket Nos. 151; 165).  HDR further argues that Walsh/Granite's withholding for quantity growth items which are not expressly listed on the Matrix constitutes a breach of the agreement and that it otherwise is sufficiently capitalized and insured such that any withholding is unreasonable.  (*Id.*).  Walsh/Granite counters in its motion for summary judgment that the provision is unambiguous and that its withholdings are authorized because all of HDR's services are governed by the standard of care set forth in the parties' agreements and that HDR is responsible for the quantity growth for the dependent items and substitute items listed in its claims.  (Docket Nos. 149; 166).

After careful consideration of the parties' arguments, and for reasons more fully stated below, the Court concludes that § XII.H is unambiguous and will grant HDR's motion, in part and deny Walsh/Granite's motion for summary judgment. Before specifically addressing the parties' positions, the Court first turns to the general principles of contract interpretation at issue in this case.

### A. Relevant Pennsylvania Law Contract Principles

Initially, the parties have not raised any choice of law issues and their agreements plainly state that Pennsylvania law governs their contractual relationship. *See Cook v. Gen. Nutrition Corp.*, Civ. A. No. 17-135, 2017 WL 4340664, at *11 (W.D. Pa. Sept. 29, 2017), *aff'd*, No. 17-3216, 2018 WL 4440418 (3d Cir. Sept. 17, 2018) (quoting *Kruzits v. Okuma Mach. Tool*, 40 F.3d 52, 55 (3d Cir. 1994)) ("In determining the appropriate choice of law, this Court applies Pennsylvania's choice-of-law rules. Under Pennsylvania law, 'courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.'"). Therefore, Pennsylvania law will be applied.

Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University of The Holy Ghost*, 565 Pa. 571, 590-591, 777 A.2d 418 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 565 Pa. at 591, 777 A.2d 418 (citations omitted). "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (quotation omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* To this end, Pennsylvania courts generally enforce the unambiguous terms of

agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See McMullen v. Kutz*, 603 Pa. 602, 617, 985 A.2d 769, 778 (2009) ("freely negotiated agreements entered into at arm's length are generally enforced according to their terms to allow parties the benefit of their bargains."); *see also John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 708 (Pa. Super. Ct. 2003) ("courts should not [generally] set aside terms on which sophisticated parties agreed.").

Pennsylvania law recognizes two types of ambiguities—patent and latent. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d at 614). If the terms of a contract are ambiguous, extrinsic and parole evidence is admissible to interpret the ambiguous portions of the contract. *Murphy*, 565 Pa. at 591. "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* "The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 653 (Pa. 2009) (citing *Murphy*, 565 Pa. at 591).

This Court "may grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Atkinson v. Lafayette College*, 460 F.3d 447, 452 (3d Cir. 2006) (quoting *Arnold M. Diamond, Inc. v. Gulf*

*Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). Even if certain terms of the contract are deemed ambiguous by the court, summary judgment may still be entered in favor of one of the parties if there are no genuine disputes of material fact and it is clear that one of the parties is entitled to judgment as a matter of law. *See McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

### B. *Court's Interpretation of § XII.H and Exhibit H*

In this Court's estimation, the plain language of § XII.H and Exhibit H demonstrates that such provisions are unambiguous and properly interpreted as defining HDR's potential damages for quantity growth between its preliminary designs and request for construction designs only for the material items which are expressly listed in the Matrix. (*See* Phase II Design Agreement at § XII.H; Ex. H). Further, such provisions simply do <u>not</u> define HDR's damages, if any, for quantity growth between its preliminary designs and request for construction designs as to the remainder of the materials set forth on the MOAS, including those materials designated as "dependent items" and "substitute items" by Walsh/Granite. (*Id*.). The Court reaches this interpretation for several reasons.

First, consistent with the parties' agreement, the language of § XII.H and the Matrix shall be interpreted "simply" and these documents are to be read together consistently and in a harmonious manner. (Phase II Design Agreement at § XIII.J). Read as a whole, § XII.H makes clear that it was the parties' intent that HDR would potentially be subject to damages under that provision for only those items listed in the Matrix. (*Id.* at § XII.H). To this end, the parties agreed that "[t]he final, fully developed Matrix has been mutually agreed upon by [Walsh/Granite] and [HDR] and is included herein to evidence such agreement" and "[t]he Matrix lists <u>all</u> those items for which unit quantities…have a reasonable probability of changing." (*Id.* (emphasis added)).

Section XII.H further states that "[i]n particular[,] the Matrix identifies by line item (i) certain categories of materials required to construct the Project and, where applicable, equivalent production units which may include various type materials." (*Id*.). Section XII.H also contains an acknowledgment by Walsh/Granite that HDR provided it reasonably foreseeable quantity variances "for each of the materials and equivalent unit line item categories listed in the Matrix." (*Id*.). Read together, these provisions simply mean that all items subject to the damages provision in § XII.H are listed in the Matrix and further explain that the items listed in the Matrix may consist of "categories of materials" or "equivalent production units" with "various type materials." On the Matrix itself, the items subject to the damages provision are all set forth in the column titled "Element-Item Description." (Phase II Design Agreement, Ex. H). Finally, since none of the "dependent items" nor "substitute items" proffered by Walsh/Granite are listed in the Matrix, any quantity variations as to same are not pertinent to determining HDR's damages under § XII.H.

Second, the parties agreed that the Phase II Design Agreement is a fully integrated contact such that extrinsic evidence, including evidence of the parties' prior negotiations, is generally not admissible to interpret the agreement. *See Yocca v. Pittsburgh Steelers Sports, Inc*., 578 Pa. 479, 498, 854 A.2d 425, 436-37 (2004) ("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."). In this regard, sections III.E. and XIII.D plainly set forth the parties' intent that their entire agreement is embodied in the Phase II Design Agreement and attachments, including Exhibit H, superseding all prior negotiations or representations. (*See* Phase II Design Agreement at § XIII.D ("The Design Agreement constitutes the entire agreement between the Parties hereto. It is expressly understood and agreed that there are no agreements or

promises by and between the Parties, except his Design Agreement and any additions or changes thereto shall be in writing and signed by both Parties); § III.E ("This Design Agreement, together with the contracts that are references in this Design Agreement, the RFP, and [Exhibits A-I attached to this Design Agreement] are incorporated in this Design Agreement by this reference and form the entire agreement between the Parties, and supersede all previously oral or written agreements or representations, with the exception of [HDR's] obligations under the Design Agreement (Phase I)"). Therefore, the Court rejects Walsh/Granite's attempt to introduce evidence of the parties' prior negotiations to interpret both § XII.H and the Matrix.

Third, extrinsic evidence is also not admissible because Walsh/Granite has not demonstrated that the agreement or its attachments contain a latent ambiguity. As the Court of Appeals has held,

> "[A] claim of latent ambiguity must be based on a 'contractual hook': the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face. In other words, the ambiguity inquiry must be about the parties' 'linguistic reference' rather than about their expectations." [*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001)] (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995)). Applying these principles, we agree with Defendants that Star's attempt to identify a latent ambiguity here is without merit because there is no contractual hook. "Just as 'Ten' is not 'Twenty,' a 'corporation' cannot mean 'a limited partnership.'"

*Star Ins. Co. v. Reginella Constr. Co. Ltd.*, 685 F. App'x 118, 120–21 (3d Cir. 2017) (further internal quotation omitted). Here, Walsh/Granite's "dependent items" and "substitute items" do not rely upon a "contractual hook" or any specific provision or term of the agreement containing an alleged ambiguity. Instead, Walsh/Granite makes general claims about its expectations, i.e., that HDR should be responsible for quantity variations for items which were not listed in the

Matrix but were either materials substituted for items listed in the Matrix or were part of the same portion of the bridges HDR designed such that Walsh/Granite reasons that the quantities should be subject to the same growth variances. However, the Court's task is to interpret the language of the parties' agreement and not what they may have silently intended but did not include therein. *See Benec v. Armstrong Cement & Supply Corp.*, No. 139 WDA 2016, 2016 WL 6876320, at \*3 (Pa. Super. Ct. Nov. 22, 2016) (citing *Delaware County v. Delaware County Prison Employees Independent Union*, 713 A.2d 1135, 1138 (Pa. 1998) ("In either type of ambiguity, the inquiry focuses on what the agreement manifestly expressed, not what the parties may have silently intended.")).

Fourth, "'courts are not generally available to rewrite agreements or make up special provisions for parties who fail to anticipate foreseeable problems,'" *Wert v. Manorcare of Carlisle PA, LLC*, 633 Pa. 260, 278-79, 124 A.3d 1248, 1259-60 (Pa. 2015) (quoting *In re Estate of Hall*, 517 Pa. 115, 535 A.2d 47, 56 n. 7 (Pa. 1987)), and "[a] court cannot alter [a contract's] terms 'under the guise of construction,'" *TruServ Corp. v. Morgan's Tool & Supply Co.*, 614 Pa. 549, 39 A.3d 253, 260 (Pa. 2012) (quoting *Delaware County v. Delaware County Prison Employees Independent Union*, 552 Pa. 184, 713 A.2d 1135, 1138 (Pa. 1998)). Such principles are certainly pertinent in a situation akin to this one, where sophisticated parties negotiated an agreement, at arm's length, with the assistance of skilled counsel, and jointly drafted the agreement with opportunities for review and comment by both sides. (*See* Phase II Design Agreement at § XIII.D (the parties acknowledged that they were represented by "competent legal counsel in the negotiation of this Design Agreement and all of the terms and conditions herein were drafted jointly and subject to each Party's review, comments and negotiations.")). Having presided over this matter from the outset, and heard all of the parties' arguments over § XII.H and the Matrix, it

is this Court's opinion that the present disputes over "substitute" and "dependent" items were imminently foreseeable and the absence of language in their agreement to deal with such foreseeable issues leads the Court to conclude that there was no manifestation of intent by the parties that HDR would be subject to damages under § XII.H in either scenario.

At the same time, § XII.H also lacks any language which demonstrates that the parties intended that provision to be a limitation of liability concerning any items which were <u>not</u> listed in the Matrix. (Phase II Design Agreement at § XII.H). HDR maintains that the subheading and the use of the word "limitation" within the provision support its interpretation. The Court disagrees with both positions. As Walsh/Granite points out, the parties agreed that "[t]he headings of sections and paragraphs are for convenience only and shall not modify rights and obligations created by this Design Agreement." (Phase II Design Agreement at § XIII.G). Further, the phrase "above limitation," utilized in the last line of § XII.H must be interpreted consistently with the remainder of the provision such that it is reasonably read as meaning that the parties agreed to a limitation of liability as to only those items listed in the Matrix, as is specified in § XII.H. (Phase II Design Agreement at § XII.H). Overall, that provision simply does not address the remaining items set forth on the MOAS which are not listed in the Matrix, leaving HDR's potential damages for quantity growth of those items, if any, undefined in the Phase II Design Agreement. (*Id*.).

Having construed the parties' agreement, the Court next applies same to their cross-motions for summary judgment.

### C. *Parties' Cross-Motions for Summary Judgment*

As noted, HDR seeks a declaratory judgment that Walsh/Granite "is not entitled to withhold monies from HDR for quantity growth damages for design elements not included in Exhibit H to the Phase II Contract." (Docket No. 79 at 21). HDR maintains that Walsh/Granite

breached their contract by invoking § III.C.3 and withholding payments based on § XII.H for alleged quantity growth for items not listed in the Matrix. (Docket Nos. 151; 165). HDR also argues that it is sufficiently capitalized and insured, making Walsh/Granite's withholding of any amount under § III.C.3 unreasonable. (*Id.*). Walsh/Granite counters that its reasons for withholding the funds include: quantity growth under § XII.H for items listed on the Matrix as well as "substitute" and "dependent" items; alleged overbilling; and delay damages, among other things. (Docket Nos. 149; 166). Walsh/Granite posits, in the alternative, that if HDR is not liable for the "substitute" and "dependent' items under § XII.H, that HDR breached the Phase II Design Agreement by failing to include those items in the Matrix and/or breached the Phase I Design Agreement due to its erroneous quantity estimates provided in the MOAS. (*Id.*). Having considered the parties' arguments, HDR's motion for summary judgment is granted, in part and denied, in part and Walsh/Granite's motion for summary judgment is denied for the following reasons.

It is well established that Plaintiff must prove all of the following elements to sustain a breach of contract claim under Pennsylvania law: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)). While the interpretation of a contract can generally be decided by the Court as a matter of law, summary judgment is not appropriate on a breach of contract claim if there are genuine disputes of material fact as to any of the elements of same. *See Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 252-53 (3d Cir. 2017).

In light of the Court's interpretation of the Phase II Design Agreement, it necessarily follows that HDR's motion for summary judgment is granted to the extent that § XII.H is

interpreted as covering only those items expressly listed in the Matrix and the agreed-upon mechanism for calculating HDR's quantity growth damages in § XII.H is not applicable to the "substitute" and "dependent" items presented by Walsh/Granite. However, HDR's motion is denied in all other respects as there are genuine disputes of material fact as to whether the Phase II Design Agreement was breached by HDR and if funds were reasonably withheld by Walsh/Granite. In a similar vein, Walsh/Granite's motion for summary judgment is denied because there are genuine disputes of material fact as to whether the Phase I and Phase II Design Agreements were breached by HDR and whether the funds were reasonably withheld by Walsh/Granite. Among numerous disputes set forth in their Rule 56 responses to concise statements of material facts, the parties contest all of the following:

- the amounts Walsh/Granite is withholding from HDR, (*see* Docket Nos. 156 at ¶¶ 135; 158 at ¶¶ 42; 43; 48; 53; 54; 61; 62; 63; 68);

- the reasons why Walsh/Granite is withholding funds from HDR, (*see* Docket No. 156 at ¶¶ 135; 137; 158 at ¶¶ 44; 69);

- whether HDR performed its services, (including quantity estimations), in conformance with the Standard of Care, (*see* Docket No. 156 at ¶¶ 100; 132; 137); and,

- HDR's insurance coverage and capitalization, (*see* Docket No. 158 at ¶¶ 74-77).

All told, resolution of these factual disputes through an assessment of the credibility of the competing evidence is necessary prior to a determination of whether Walsh/Granite has properly withheld "an amount reasonably necessary to fully protect itself against any liability or damage relating in any way to this Design Agreement, [HDR's] acts or omissions, or [HDR's] breach of this Design Agreement." (Phase II Design Agreement at § III.C.3). Given same, HDR's motion

for summary judgment is denied, in part and Walsh Granite's motion for summary judgment is denied.

VI.     CONCLUSION

Based on the foregoing, HDR's motion for summary judgment is granted, in part, and denied, in part and Walsh/Granite's motion is denied.  An appropriate Order follows.

_s/Nora Barry Fischer_____
Nora Barry Fischer
United States District Judge

Date:   March 27, 2019

cc/ecf:  All counsel of record.